IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| NORCREST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-6025-CV-SJ-HFS |
| | ) | |
| COLLATERAL MORTGAGE CAPITAL LLC, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Having ruling against Norcrest in its claim against Genworth, its lender in a real estate mortgage transaction, I now deal with the summary judgment motion filed by Norcrest's refinancing agent, Collateral, on a claim that Collateral misrepresented the obligation in the note for a prepayment fee.

In my ruling for Genworth, I summarized my understanding of the claim of misrepresentation by Collateral as being that there would be no fee due for prepayment, except for the 1% charge, "if interest rates rose between the time the Amended Note was executed and the time of prepayment." This was essentially what Robert Modeer, the co-owner of Norcrest, was advised by his agent, Matthew Brown, as a representation by Mike Blake, on behalf of Collateral. The matter is rather more complicated. Blake warned against an immediate repayment, before interest rates rose. Brown testified on deposition that Blake predicted an increase in rates and said that if rates rose "enough" there would be no charge other than 1%. Brown Dep. p. 12, Doc. 66-2. Brown did not, however, purport to remember an "exact wording" of the representation, but understood Blake to tell him "it's going to be fine" because of the direction of rate changes. Brown Dep. p. 81.

The gist seems to be that a moderate, anticipated increase would suffice. In other words, a dramatic and unanticipated rate increase would not be necessary to stop the sizable charge. That seems to be what Brown understood would be "enough" and what he conveyed to Modeer contemporaneously.

Defendant may have an argument that the representation was too vague and indefinite to be relied on, but I do not see that issue adequately briefed.[1] A jury question may be presented as to whether a clear message was given and received.

In practical terms, in the absence of expert guidance, I note that it would seem to take an extraordinary increase in rates to avoid the charge. In the months after the note was signed, there was a rate increase from 4.26% to 4.36%, which seems consistent with the prediction, if rather feeble. Interest under the note was 6.03%. If Treasury rates would have to rise to roughly 6% before the formula would be satisfied without a charge, that would be roughly a 50% increase, which presumably Blake was not predicting. Therefore, the formula itself was arguably being misrepresented, as plaintiff claims.

Collateral contends the note has an unambiguous provision conflicting with the alleged oral misrepresentation and that Norcrest cannot claim to have been misled because it had an obligation to read the provisions of the note. The controlling case, according to Collateral, is Hamra v. Magna Group, Inc., 956 S.W.2d 934 (Mo. App. S.D. 1997). The other case cited for what Collateral says is a long-standing rule of Missouri law is Edmund S. Mills Corp. v. Stinebaker, 67 S.W.2d 821 (Mo. App. 1934).

---

[1] Reliance on Watkins v. Gross, 772 S.W.2d 22 (Mo. App. E.D. 1989), might help Collateral if Norcrest were complaining about a bad prediction regarding interest rates, but that is not the thrust of the complaint. Bad predictions have, moreover, been held actionable on occasion. Doll v. Purple Shoppe, 90 S.W.2d 181 (Mo. App. 1936).

2

The Edmund S. Mills case is one in which the party claiming to have been misled prevailed, because it was found that the terms of the document were concealed before signing. The source of the language on "duty to read," which colorfully expresses Collateral's theory, is Dickinson v. Bankers Life Cas. Co., 283 S.W.2d 658 (Mo. App. 1955).

Hamra is probably Collateral's best authority, unless it and I have missed something more clearly in point. In that case, a former director claimed coverage on the company's deferred compensation plan, saying he was told by an agent that it would be payable at age 65, whether or not he remained a director. A provision in the plan, however, clearly terminated any obligation if service as a director terminated prior to the 65th birthday. Collateral contends this is comparable, at least in principle, to the contract language here, awarding the lender lost interest for the entire anticipated period of the loan, discounted to current value. Amended Note, ¶ 4, Doc. 66-8. A Treasury rate was designated for use in calculating the discount, using a complex formula.

The problem here, not dealt with in the cited cases, is that the wording of the prepayment obligation may be considered unambiguous, since no one now contests how it was to be applied, but part of the obligation is so complex that neither an ordinary businessman nor a lawyer could predict or determine the exact result. Norcrest's lawyer said he did not understand the provision. Collateral's briefing does not contain a step by step explanation, and I confess I could not calculate the fee without expert testimony from an economist or other financial expert.

What I can determine, from the plain reading of some of the words, is that there is no exemption from the formula simply because interest rates may have risen. Even a moderate increase would not suffice. Therefore, a misrepresentation apparently occurred if a jury accepts Norcrest's testimony.

3

A trier of fact may determine that the misrepresentation could have been exposed by a businessman's careful reading of the prepayment fee provision, and making a rough calculation as I have done, but it seems rather obvious that a contrary result could be reached. A jury might agree with Norcrest's counsel that Norcrest "could not understand" the provision and had a right to rely on a representation by a person presumably more expert and having a duty to be candid with Norcrest.

The prepayment provision was, therefore, apparently unambiguous if the language could be understood. It may be compared with a paragraph written in English, with several sentences in French. I do not see anything in Missouri law that helps Collateral in a case like this one.

<u>Dickinson</u>'s language, as quoted by Collateral, is supplemented by the qualification that "[t]here was nothing which was difficult to read or to understand or which was confusing in the writing . . ." 283 S.W.2d at 663. Further, there was "no gross inequality between the parties and no claim that the parties stood in any relationship of trust and confidence."

I conclude that the <u>Hamra</u> theory alone is not dispositive and Collateral should not be freed from the obligation to litigate further or settle the case.

Collateral's motion for summary judgment (Doc. 65) is therefore DENIED.

/s/ Howard F. Sachs  
HOWARD F. SACHS  
UNITED STATES DISTRICT JUDGE

September  16 , 2008

Kansas City, Missouri